# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| Dr. SCOTT J. BRODIE )| |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF HEALTH ) | Civil Action No. __ |
| AND HUMAN SERVICES ) | |
| 200 Independence Avenue, S.W. ) | |
| Washington, D.C. 20201Washington, D.C. 20201 ) | |
| ) | |
| SYLVIA MATHEWS BURWELL ) | |
| Secretary of Health and Human Services ) | |
| U.S. Department of Health and Human Services ) | |
| 200 Independence Avenue, S.W. ) | |
| Washington, D.C. 20201 ) | |
| ) | |
| DON WRIGHT ) | |
| Acting Director, Office of Research Integrity ) | |
| U.S. Department of Health and Human Services ) | |
| 1101 Wooton Parkway, Suite 700 ) | |
| Rockville, MD 20852 ) | |
| ) | |
| and ) | |
| ) | |
| NANCY GUNDERSON ) | |
| Acting Deputy Assistant Secretary ) | |
| Office of Grants and Acquisition Policy and ) | |
| Accountability ) | |
| U.S. Department of Health and Human Services ) | |
| Hubert H. Humphrey Building, Room 336-E ) | |
| 200 Independence Avenue, S.W. ) | |
| Washington, D.C 20201 ) | |
| ) | |
| Defendants. ) | |

_____)

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## NATURE OF ACTION.

In 2010, plaintiff, Dr. Scott J. Brodie — who, during the relevant period (1999-2001), had been working as a molecular pathologist and biomedical researcher at the University of Washington ("UW") — was debarred by the Department of Health and Human Services ("HHS") from receiving any federal grants or contracts for seven years. Debarment was based on findings that he engaged in scientific research misconduct for work carried out between 1999 and 2001. There have been two prior lawsuits in this court challenging the agency's findings and debarment decision on different grounds. Summary judgment was awarded for the defendants. *See Brodie v. U.S. Dep't of Health & Human Services,* 796 F. Supp. 145 (D.D.C. 2011) and *Brodie v. U.S. Dep't of Health & Human Services,* Civ. 951 F. Supp. 2d 108 (D.D.C. 2013), *summ. aff'd* 2014 WL 21222 (D.C. Cir 2014).

This Complaint is based on new evidence recently obtained by Dr. Brodie through state public records requests that for the first time reveals:

- that the electronic files on a work computer exclusive to Dr. Brodie, and containing all of his raw data, first-generation images, email threads with other researchers, and metadata (Data) had been knowingly and intentionally destroyed by UW researchers during the early stages of the university's federally mandated investigation;

- that this spoliation of evidence was known by university investigators who were also part of UW's investigation committee;

- that the fact of the deletion of the Data was knowingly and fraudulently withheld from Dr. Brodie and the UW investigative committee presiding over the university's research misconduct proceedings;

- that the fact of the  deletion of these Data was knowingly and fraudulently withheld from HHS investigators, the presiding administrative law judge ("ALJ"), and the debarring official, Nancy Gunderson;

- that this information was also knowingly and fraudulently withheld from Dr. Brodie throughout the UW and HHS investigations despite his numerous and specific requests for access to the Data on his work computer and the other sequestered hard drives and his repeated assertions that the data on these computers and hard drives were essential to his defense;

- that the data that  ORI believed to have originated from "Dr. Brodie's computer" had in fact come, not from Dr. Brodie's computer, but instead from a communally shared lab computer, which contained data and images that were neither the product of Dr. Brodie's own research nor reflective of what he intended to publish;

- that, as Dr. Brodie had accurately represented to the ALJ, those computers that contained his personal Data were never, in fact, returned to him and his Data files were never, in fact, made available to him throughout the entire UW and ORI investigations, thereby making it impossible for him to respond to ORI's charges with the specificity required by ORI and the ALJ; and

- that the spoliation of the Data and the withholding of the evidence of the Data's spoliation from UW and ORI investigators, from the HHS ALJ and deciding official, and from Dr. Brodie, irreparably and irretrievably tainted the entire process from start to finish.

The knowing and fraudulent destruction and spoliation of these Data deprived Dr. Brodie of his statutory and due-process rights to defend himself against the career-damaging seven-

year debarment, completely undermined the integrity of HHS's fact-finding process, and is in violation of Dr. Brodie's rights under the Administrative Procedure Act, the Public Service (PHS") Regulations, and the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

## JURISDICTION AND VENUE.

1.   Jurisdiction is founded on the existence of federal questions arising under the  Fifth Amendment to the Constitution of  United States, the Administrative Procedure Act, 5 U.S.C. §§ 551-706  and the regulations of HHS in force for proceedings of its Office of Research Integrity, 42 C.F.R., part 50.

2.   Venue is established in this District pursuant to 28 U.S.C. § 1391(b) and 5 U.S.C. § 703.

## PARTIES.

3.   Plaintiff, Dr. Scott J. Dr. Brodie ("plaintiff" or "Dr. Brodie"), is a citizen of the United States and resides in New Jersey.

4.   Defendant United States Department of Health and Human Services ("HHS") is an agency of the United States whose headquarters office is located at 200 Independence Avenue, S.W., Washington, D.C. 20201.

5.   Defendant the Honorable Sylvia Mathews Burwell is the Secretary of Health and Human Services (the "Secretary").  The Secretary is sued in her official capacity as the department head of HHS and its components and, for this purpose, she resides at HHS's headquarters.

6.   Defendant Don Wright is the Acting Director of the HHS Office of Research Integrity ("ORI"). Mr. Wright is sued in his official capacity as the head of ORI and, for this purpose, he

resides at ORI's headquarters, located at 1101 Wooton Parkway, Suite 700, Rockville, MD 20852.

7.  Defendant Nancy Gunderson is the HHS Deputy Assistant Secretary for the Office of Grants and Acquisition Policy and Accountability.  Ms. Gunderson is sued in her official capacity as the HHS official designated to impose debarment and, for this purpose, she resides at HHS headquarters.

## FACTS.

### A.  UW's Investigation, and its Failure to Sequester and Secure the Relevant Computers and Hard Drives.

8.  Dr. Brodie is a molecular pathologist and was a Research Assistant Professor in the Department of Laboratory Medicine at the University of Washington ("UW") and the Director of its Retrovirus and Molecular Virology Laboratories from 2000 to 2002. During the relevant time period, Dr. Brodie worked in the highly competitive areas of human herpesvirus and retrovirus (HIV/AIDS) pathogenesis. Dr. Brodie was an accomplished virologist and had worked for several different institutions before joining UW in 1995.

9.  Upon information and belief, sometime in 2002, one of Dr. Brodie's scientific competitors contacted ORI and accused Dr. Brodie of having falsified or fabricated data and images contained in a manuscript based on research conducted in Dr. Brodie's lab between 1999 and 2001, claiming that "the data [from the 13 coauthors] was too good to be true."

10.  In September 2002, pursuant to  HHS regulations, 42 CFR part 50, subpart A, UW began an inquiry into several allegations against Dr. Brodie.

11.  On November 14, 2002, UW's Dr. James Mullins and Dr. John Mittler, who were sometimes collaborators and sometimes competitors of Dr. Brodie, produced a CD with 10 "questionable" images that they claimed to be the product of Dr. Brodie's

research, even though Dr. Mullins admitted that these images had originated from his computer.  Dr. Mullins had conferred with Dr. Brodie in the past about data that he either did not understand or had questions about, but had "always" been able to examine the data and confirm that Dr. Brodie's original data, images, and results, were authentic, reliable, and valid.  On this occasion, however, UW Vice Provost Cheryl Cameron inexplicably directed Dr. Mullins not to review the data with Dr. Brodie.

12. HHS's PHS Regulations provide that universities and other institutions receiving federal funds must conduct a full and fair investigation of research misconduct allegations. 42 CFR § 50.103. *See* 42 CFR §93.310 (new regulations in effect as of May 16, 2005; these regulations, which are set forth in 42 CFR Part 93, superseded the previously applicable PHS regulations that were set forth in 42 CFR Part 50).

13. PHS Regulations require that a university must "comply with its own administrative process." 42 CFR 50.103(a) (2);  must obtain all relevant research records, *See* 42 CFR §93.310 (d), and must "promptly take all reasonable and practical steps to obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding, inventory the records and evidence, and sequester them in a secure manner." 42 CFR §93.305(a). *See also id.*at § 93.307(b). UW Executive Order 61, then in force, provided that "Faculty, staff, and students are required to release to the OSI [ the Office of Scientific Integrity] and UCIRO [the University Complaint and Investigation Office] all original databooks, records, laboratory notes, and/or other materials that are determined to be necessary. The OSI and UCIRO shall be responsible for the safe keeping of the records in their custody."

14.  Throughout UW's multi-year investigation, only image files formed the basis for the misconduct allegations. To insure that computer files are not inadvertently misattributed to the wrong researcher, PHS regulations require university investigators to ensure that electronic media, including images from computer hard drives, be "reflective of the actual results" and should be "shown to have originated with a particular individual." *See* 42 C.F.R. §93. 224 & 93.305. UW's report would indicate that the electronic media that was seized was not reflective of the actual results.

**B.  Spoliation of the Data and the Missing Computer Evidence.**

15.  During the early stages of its investigation, UW investigators seized and sequestered over 50 computers and hard drives allegedly relating to Brodie's laboratory, offices, and homes, and from the laboratories of other researchers with whom Dr. Brodie was collaborating or competing.

16.  During the course of the UW and ORI investigations and the ALJ proceedings, three particular computers were the focus of attention by the investigators.

17.  The first computer, labeled by UW forensic technicians as "SB Home," was a desktop computer seized by UW investigators from Dr. Brodie's home on September 5, 2002, the date that UW administrators first notified Dr. Brodie of the allegations. SB Home was the computer that UW's investigative committee, ORI and the ALJ, despite Dr. Brodie's numerous objections, understood to be Dr. Brodie's main work computer and the computer that most or all of image files in the misconduct allegations had originated.

18.  The SB Home was a computer Dr. Brodie had borrowed only weeks before the September 5th seizure. SB Home was borrowed while Dr. Brodie's main work computer ("SB

Residence") was at the university's Computer Maintenance and Support Service Center for repair.

19.  The metadata on SB Home shows that most of these files were last modified by Dr. Brodie's colleagues and competitors, and corroborates previous testimony from a variety of sources, including Dr. David Muthui, that all of the researchers in the lab "would borrow computers from the lab, whenever necessary, to work on these projects at home during the evenings and weekends. The lab computers were all shared..."

20.  The second computer of interest was a laptop computer labeled "SB Laptop." During the UW investigation, Dr. Brodie informed UW investigators that he had been using this laptop to transport data and documents from and to the SB Residence computer; and that he alone had access to these computers. This laptop was never recovered. During both UW's and ORI's investigation, and the subsequent HHS administrative proceedings, Dr. Brodie made a number of requests for the data on the SB Laptop computer but neither UW nor ORI ever provided any such data to Dr. Brodie. This failure to produce the SB Laptop data was the subject of Dr. Brodie's second complaint filed in this Court in 2013. *See Brodie v. U.S. Dep't of Health & Human Services,* 951 F. Supp. 2d 108 (D.D.C. 2013) *sum aff'd* 2014 WL 21222 (D.C. Cir 2014).

21.  The third computer was a Dell desktop computer, which UW investigators referred to as the computer "kept at his [Dr. Brodie's] residence" and which is referred to herein as "SB Residence." This computer contained all of Dr. Brodie's lab notes, original data, drafts of grants and communications with colleagues.  This computer is the subject of this action.

22.  SB Residence was purchased from Dell Computers in November 2000 for Dr. Brodie's sole and exclusive use at his home where he was working during this time.  During the

UW investigation, Dr. Brodie informed UW investigators that SB Residence was his principal computer on which he organized and archived all of his raw data, first-generation images, draft and final grant applications with all supporting data verifying the rigor of his published research ; that SB Residence contained his draft Power Point presentations, and the draft manuscripts, including those relating to the 1999 to 2001 experiments and publications; that SB Residence had been used solely and exclusively; that in the weeks prior to the September 5, 2002 sequestration, he had been using the lab computer labeled as the "SB Home" computer by UW forensic technicians), which had recently been purchased for the lab in April 2002; that he had brought his residence computer (SB Residence) to UW's Computer Maintenance and Support Service for repairs at the time he then borrowed the lab computer that UW dubbed "SB Home"; and that SB Residence was thus in UW's possession at the time UW investigators had sequestered and secured the computers and hard drives in this case.

23.   During the UW and ORI investigations, Dr. Brodie informed UW and ORI that the many images obtained from the SB Home and the other computers could not be ascribed to Dr. Brodie because the computer was communally shared by over 21 Principal Investigators ("PIs"), researchers, and lab technicians, including those associated with Dr. Mullins, Dr. Mittler and other competitors and accusers of Dr. Brodie, and that most of the files on those computers had been generated not by him, but by others.

24.   During UW's investigation and the HHS ALJ's administrative proceedings, Dr. Brodie repeatedly requested, and was repeatedly denied, access to all of his data that were on all of the computers he used at  his home in order to show that he did not make any alterations in the data or images allegedly found on the other computers examined by UW and ORI, and also to

show how and why he would not have been aware of any mistakes, anomalies, or alterations in any data or figures in the research record that formed the basis for the allegations against him.

25.  PHS Regulations then in force required universities conducting an investigation to include an "examination of all documentation" relevant to the allegations lodged before making any findings. 42 CFR § 50.103(d)(7).

26.  Despite the critical nature of the Data on the SB Residence, Dr. Brodie's original files were deleted during the early stages of UW's investigation.   This information was never revealed to Dr. Brodie nor was this information ever revealed to the UW investigation committee, even though within the scientific community it is never permissible for researchers or lab technicians to alter or delete the data of another researcher; even though "laboratory sabotage" has been deemed by ORI to constitute a particularly malicious form of research misconduct; and institutions such as UW have a legal obligation to notify ORI if it has a reason to believe that that material data has been destroyed or a  possible violation of civil or criminal law has occurred  during a research misconduct proceeding.  *See* PHS Regulation, 42 CFR § 50.104 (b) (5) (now appearing as 42 CFR § 93.318 (d)).

27.  In December 2003, UW issued a report finding that Dr. Brodie had committed 15 instances of research misconduct and, based on these findings, UW banned him from future employment at the university. On March 7, 2004, UW issued an erratum to the report acknowledging that many image files referenced in the report had been mislabeled by UW.

### C.  ORI's Investigation, the ALJ's Denial of a Hearing, and HHS's Debarment Order.

28.   In December 2003, UW sent its final investigative report to HHS's Office of Research Integrity (ORI) for ORI to perform its own investigation into the allegations of scientific misconduct.

29.   In 2005, the 1998 PHS regulations were superseded by a new set of regulations (the "2005 Regulation") that became final on May 17, 2005 (70 Fed. Reg. 28,370).  The new regulations made a number of significant changes, including: (a) broadening the scope of the covered activity to include the "reviewing" of research, *id.*at 20,779-80;  and  (b) expanding the required mens rea from intentional and knowing to include recklessness, *id.*

30. The 2005 Regulations expressly provided that with regard to matters pending at the time the new rules came into effect, the new procedural requirements would be "applicable to the institution's subsequent steps in that proceeding," but that  "the definition of research misconduct that was in effect at the time the misconduct occurred would apply."  70 Fed. Reg. 28370, 28380 (2005).

31.   The new PHS Regulations required that the university "provide to ORI upon request all relevant research records and records of the institution's research misconduct proceeding, including results of all interviews and the transcripts or recordings of such interviews," *id.*at § 93.313(h), and that all relevant records be maintained by the institution for seven years, *id.*at § 93.317(d).

32.   On September 17, 2008 ORI filed a charge letter notifying Dr. Brodie that it was charging him with having engaged in 15 instances of research misconduct — including several allegations not previously identified in UW's report — and that ORI had recommended his debarment.

33.  On October 16, 2008, Dr. Brodie filed a Request for Hearing challenging ORI's findings and proposed debarment and requested a full evidentiary hearing before an ALJ.

34.  On one or more occasions, Dr. Brodie expressly asked ORI to provide "Any and all documentation for portable/travel or home computers used by Scott Brodie."

35.   The PHS Regulations, then in force for "requesting a hearing on these ORI findings" required that ORI provide respondents with a full and fair evidentiary hearing before the Departmental Appeals Board ("DAB").  *See* 69 Federal Register at 20,783 (April 2004).

36.  Due to the destruction of the Data on the SB Residence, Dr. Brodie was prevented from establishing a factual record to refute ORI's claims, and summary judgment was granted against him.

37.  On March 18, 2010, Nancy Gunderson, then-Acting Deputy Assistant Secretary for the Office of Grants and Acquisition Policy and Accountability and the agency's Debarring Official, notified Dr. Brodie that she had accepted the ALJ's recommendations and that he would be debarred from receiving federal grants and contracts for a period of seven years. *See* Letter from Gunderson to Dr. Brodie at 2.

**D.  Prior Litigation.**

38.  In April 2010, Dr. Brodie filed a civil complaint in the United State District Court for the D.C. District, challenging his debarment on a number of procedural and legal grounds, *Brodie v. Health & Human Services,* 796 F. Supp. 145 (D.D.C. 2011), including that the ALJ improperly applied the recklessness standard from the 2005 regulations, even though those regulations expressly provided that "the definition of research misconduct that was in effect at the time the misconduct occurred would apply."  70 Fed. Reg. 28370, 28380 (2005).

39.  On July 13, 2011, District Court Judge James E. Boasberg issued a memorandum and order granting HHS's motion for summary judgment on the ground that the ALJ did not act in an arbitrary and capricious manner and did not otherwise violate the Administrative Procedure Act or the PHS regulations.  The issues raised in that complaint are not being raised herein.

40.  On November 3, 2011, Dr. Brodie filed a petition asking the ALJ to reopen the research misconduct proceeding on the additional ground that ORI had violated *Brady v. Maryland,* 373 U.S. 83 (1963) by failing to provide him with access to SB Laptop on which he transported  data and images between the lab and his home computer.  Dr. Brodie claimed that an ORI attorney had inadvertently admitted at a compliance conference that ORI had had access to SB Laptop during its investigation, even though it had never provided access to the computer or its contents to Dr. Brodie. ORI responded that its counsel had misspoken and that agency had never, in fact, received SB Laptop or its contents during the administrative debarment proceedings.

41.  The ALJ rejected Dr. Brodie's petition to reopen the proceedings, asserting that he lacked the authority to do so.  Subsequently, defendant Gunderson, the debarring officer, also denied the request to reopen.

42.  On July 10, 2012, Dr. Brodie filed a second complaint in this Court challenging HHS's decision not to reopen the debarment proceeding.  On June 27, 2013, this Court, in a decision by Judge Rosemary M. Collyer, granted HHS summary judgment on the grounds that "neither party can point to any information that was derived from the laptop as the basis of ORI's allegations of misconduct". *See Brodie v. Dep't of Health & Human Svcs.,* 951 F.Supp.2d 108 (D.D.C.2013*), sum aff'd,* 2014 WL 21222 (No. 13-5227) (D.C. Cir., Jan. 10, 2014). The issues raised in that law suit are not being raised herein.

**F.  New Evidence of Spoliation of Key Evidence
and the Failure of UW Researchers to Reveal this Information
to the UW Investigative Committee, ORI Investigators, the ALJ, and Dr. Brodie.**

43.  Beginning in 2008, Dr. Brodie began making public-records requests under the
Washington State Public Records Act, Wash. Rev. Code §§ 42.17.010 *et seq*., to the Office of
Public Records  (UWORP), for all evidence contained in UW's file on Dr. Brodie's case.

44.  Dr. Brodie's initial public records requests were all denied on the ground that
information obtained during the UW's investigation was exempt and not producible until after
the investigation had been completed.

45.  In 2013, a public records request was filed on Dr. Brodie's behalf with the UWOPR
for all documents relating to UW's investigation of Dr. Brodie.

46.  In April 2013, UWORP produced a batch of documents, including emails and
other documents, establishing that researchers and lab technicians affiliated with Dr.
Brodie's competitors had knowingly deleted data on the SB Residence computer in
December 2003 during the pendency of UW's investigation.  The new documents
indicated that information about this destruction of evidence was shared with one or more
UW lawyers and administrators involved in the investigation of Dr. Brodie.

47.  In particular, the new documents show:

(a)  that early in UW's investigation of Dr. Brodie, UW investigators went to Dr.
Brodie's home, at his request, to retrieve the borrowed desktop computer, which UW forensic
technicians and investigators later labeled as the "SB Home" computer;

(b)  that, Dr. Brodie explicitly told UW's inquiry team leader, Dr. John Slattery, in
September 2002, well before the UW inquiry and investigation reports were issued, that aside
from his laptop (SB Laptop), he had been using two different desktop computers at his home, the

one that investigators had seized, which he had temporarily borrowed from the laboratory and had only been using for several weeks (SB Home), and a second, which had been ordered for him as his official residence desktop computer (SB Residence) that was then in the university's IT shop for repair;

(c)  that a UW administrator, Gail Schmitz, provided UW Attorney Michael Keller, UW's "Investigation and Resolution Specialist" who assisted in UW's investigation of Dr. Brodie, with an invoice confirming that UW had purchased SB Residence, a Dell Desktop Computer on November 30, 2000 for Dr. Brodie's sole and exclusive home use;

(d)  that Kurt Diem, an experienced technician who had worked for both Dr. Lawrence Corey and for Dr. James Mullins, one of Dr. Brodie's competitors and accusers, and who was aware of the investigation of Dr. Brodie, sent an email to UW's Attorney Michael Keller admitting that the Dr. Brodie's primary residence computer (SB Residence) showed up in the Rosen laboratory after UW's investigation had begun and that "[w]e deleted most of [Dr. Brodie's] files," even though UW's investigation was well under way:

> To all concerned:
> The computer with the Lab Med tags 1193702 and 30021731 was ordered specifically for use by Scott Dr. Brodie at home. When it arrived in the T-293X lab it was transported to Scott's house without being set up or used in that lab. It did not return to that lab or to the Rosen lab until after the investigation began. **We have subsequently deleted most of Scott's files and have been using it for general Office software purposes. (emphasis added)**

(e)  that two days after Mr. Diem's admission that they deleted most of Dr. Brodie's files, another technician in Dr. Corey's laboratory, Laurence Stensland, sent UW Attorney Keller an e-mail confirming that the computer identified by Diem had "**mysteriously appear[ed]** in the lab after the investigation started and is currently in use here" (emphasis added);

(f) that in November 2003, while Dr. Brodie's research was supposed to have been sequestered pending a final decision by UW, Diem secretly obtained from UW's evidence locker Dr. Brodie's research materials and provided them to Dr. Mullins — a competitor who had been paying Diem's salary;

(g)  that on June 17, 2003, UW Attorney William Nicholson, sent an email to UW Attorney Michael Keller [falsely] claiming that "Scott Brodie's Desktop Computer" (i.e., SB Residence) had been returned to Dr. Brodie, when in fact it had not, and acknowledging that there had been "some confusion about whether Dr. Brodie's computers were returned to him," that "Dr. Brodie says no," and that it was "critical that the University trace the physical return of the hard drives back to Dr. Brodie";

(h)  that, upon information and belief, UW Attorneys Keller and Nicholson, and other UW officials, knew that Dr. Brodie's computers, including SB Residence, and the critical Data on them, had, in fact, not been returned to him; and

(i) that UW attorneys, administrators, and officials did not inform the UW investigation committee members, UW's deciding official, or Dr. Brodie that SB Residence was the primary repository for Dr. Brodie's raw data, first-generation images, email threads with other researchers, and metadata; that the files on SB Residence had never been deleted by UW personnel after the investigation had started one or more associates of Dr. Mullins's had intentionally deleted the files containing Dr. Brodie's raw data; that these same associates had then conducted "their own investigation into Dr. Scott Brodie's papers and grants" all the while knowing they had deleted his data; and that SB Residence had mysteriously appeared at the lab and that these associates secreted the importance of the SB Residence Computer by attempting to

use it as a general use administrative computer operated by lab technicians affiliated with Dr. Mullins's and Dr. Corey's laboratories while the investigation was still under way.

48.   Upon information and belief, UW attorneys, administrators, and other officials did not inform UW's scientific investigators and the members of its investigative committee, ORI investigators, the HHS ALJ, or HHS's deciding officer Gunderson that SB Residence was the primary repository for Dr. Brodie's his raw data, first-generation images, email threads with other researchers, and metadata; that the files on SB Residence had never been secured by UW administrators but in fact had been deleted; that one or more associates of Dr. Mullins and members of his laboratory had deleted the files containing Dr. Brodie's raw data;  and that SB Residence had "mysteriously" appeared at and was being used by Mr. Diem and other members and affiliates of Dr. Mullins's laboratory while the investigation was under way.

49. While ORI variously claimed to have obtained from UW "Respondent's computer," "Dr. Brodie's computer," and "Dr. Brodie's home computer" in their September 2008 charge letter, it is now clear that ORI never obtained — and as we now know, could not have obtained — SB Residence or the Data it contained, nor did it learn until Dr. Brodie's recent motion to reopen HHS's administrative process that the files on SB Residence had been knowingly destroyed by UW employees while the investigation was pending.

50.   Apparently unaware that the relevant Data had been deleted, ORI investigators expressly relied upon Dr. Brodie's failure to come forward with supporting data, stating that Dr. Brodie "failed to reveal the existence of computer files that contained images and data compilations that he reported or caused to be reported in materially different forms."

51. The spoliation of the evidence by UW employees and UW's failure to inform UW's Investigative Committee, UW's deciding official, ORI, the HHS ALJ, HHS's deciding official, severely prejudiced Dr. Brodie's case at all stages of the proceedings against him because the entire process was irreparably and irretrievably tainted from start to finish. The spoliation of the evidence also made it impossible for Dr. Brodie to use the Data and images from SB Residence for many reasons, including the following:

- to show that the "electronic media" on Dr. Brodie's work computer was, in fact, "reflective of the actual results" and data he and his lab had properly obtained;

- to show what Dr. Brodie believed he was publishing when he included the images in question in the Power Point presentations, manuscripts, and grant applications that he prepared and that he had good reason to believe that these images were the result of valid research;

- to show that Dr. Brodie "was always of the belief that the images in ORI's charges were 'reflective of the actual results obtained from the experiments,'" notwithstanding the ALJ's finding that he "offer[ed] no evidence to substantiate this assertion," *See* ALJ Decision at 7;

- to refute claims by Dr. Mullins and other of Dr. Brodie's accusers that many of the questioned images in Dr. Mullins grants came from Dr. Brodie, when in fact they came from Dr. Mullins and Dr. Mullins's collaborators;

- to show that UW's investigation report contained false, inaccurate, and misleading information and did not, in fact, support the investigative committee's findings;

- to show that Dr. Brodie's e-mail responses on SB Residence were consistent with those produced in recent public record disclosures and that Dr. Brodie actually believed that what he published or attempted to publish was "true and accurate";

- to show that, without his electronic records, Dr. Brodie — as has he repeatedly maintained before UW, ORI, and the ALJ — could not properly defend himself against accusations that he knowingly and intentionally committed research misconduct; and

- to show that, without Dr. Brodie's electronic records, ORI could not meet its burden of proving by a preponderance of the evidence that Dr. Brodie knowingly or intentionally committed research misconduct.

52.   Without examining the deleted Data files, ORI could not have made an accurate and reliable determination about the nature of the images and who was responsible for allegedly creating, preparing, or publishing altered or mislabeled images.

53.   The missing files would show exactly who created, modified, altered or relabeled the original files at issue. Dr. Brodie informed UW and ORI that the Data on SB Residence would also show how the electronic images were prepared from original photographic films during the relevant time period (1999-2001) and why he believed this data to be accurate and representative of the research findings.  As a veteran ORI investigator has explained, to reliably determine whether images reviewed by ORI can be deemed authentic "evidence of research misconduct by someone involved in the preparation of the papers one would need direct access to the original data, and a fact-finding process that would require a fuller review by the institution" Affidavit of John W. Krueger, ¶86, *Sarkar v. Doe,* Mich. No. 14-013099, Dec. 9, 2014..

54.  Unaware of the spoliation of the Data, the ALJ faulted Dr. Brodie for his "failure to provide research records adequately documenting the questioned research."

55.  The newly available discovery of evidence spoliation  by UW and of UW's and ORI's failure to obtain Dr. Brodie's original data shows that ORI's administrative process was arbitrary and capricious and that its findings of misconduct by Dr. Brodie were based on inaccurate and incomplete evidence. Given ORI's responsibility for obtaining all of the relevant records and evidence, ORI's own errors and failures have resulted in the unwarranted retraction of journal articles and false and defamatory comments in on-line and other publications.

**G.  Dr. Brodie's Motion to Re-open the HHS Proceedings Based on the New Evidence of Spoliation.**

56. In May 2014, Dr. Brodie requested, pursuant to 2 C.F.R. § 180.875, that defendant Gunderson reopen the debarment proceeding and rescind her debarment order in light of the existence of new evidence critical to Dr. Brodie's defense had been knowingly and fraudulently destroyed and despoiled by and with the knowledge of UW officials and employees. *See* 2 C.F.R. § 180.880(a).

57.  On May 15, 2014, notwithstanding the new and material evidence of spoliation and suppression of the SB Residence computer evidence, Gunderson denied Dr. Brodie's request, which she reaffirmed in a letter dated August 5, 2014.

58.  Dr. Brodie's debarment remains in effect until March 17, 2017.  His debarment has precluded him from securing research-related employment both domestically and internationally.

## COUNTS

### Count I:

### Violation of the Administrative Procedure Act.

59.  Paragraphs 1 through 58 are incorporated as if set forth fully herein.

60.  The decision of defendant Gunderson not to reopen the debarment proceedings that resulted in Dr. Brodie's seven-year debarment constitutes a "final decision" within the meaning of the APA, 5 U.S.C. § 704.

61.  UW employees destroyed Dr. Brodie's original research records in violation with the Administrative Procedure Act (APA) and the PHS regulations.

62.  UW attorneys, administrators and officials were aware of the destruction of these research records during the pendency of UW's investigation but failed to inform UW Investigative Committee members and Dr. Brodie that Dr. Brodie's files had been specifically targeted and destroyed by other researchers.

63.  UW attorneys, administrators and officials were aware of the destruction of these research records during the pendency of UW's investigation but despite requests by Dr. Brodie for his computers containing his notes and original Data, failed to advise him that these files had been destroyed.

64.  UW attorneys, administrators, and officials were aware that these research records, including Dr. Brodie's original Data, were needed to authenticate his research and to determine which images and data Dr. Brodie actually intended to publish and believed he was publishing, but nonetheless failed to provide information to ORI during its administrative oversight proceedings against Dr. Brodie that the research records and Data had been spoliated.

65. The spoliation of the critical Data on SB Residence, including Dr. Brodie's original raw data, his original electronic files, the relevant metadata, and the various email and other communications from his various collaborators and competitors, undermines the accuracy of UW's factual findings and legal conclusions. ,

66. The spoliation of the critical evidence on SB Residence containing Dr. Brodie's original raw data, his original electronic files, the relevant metadata, and the various email and other communications from his various competitors and collaborators, violated Dr. Brodie's right to a full and fair defense before UW, ORI, and the HHS ALJ. The spoliation denied Dr. Brodie the opportunity to specifically show where and from whom all of the published images and data had originated, how the original Data was transferred from photographic film to digitalized image, and the exact purpose for the Data, including whether it was intended or not intended for publication by Dr. Brodie.

67. The HHS ALJ's grant of summary judgment to ORI was irreparably tainted by the spoliation of Dr. Brodie's research records by UW employees that caused the ALJ to make multiple erroneous findings adverse to Dr. Brodie.

68. Defendant Gunderson's acceptance of the ALJ's Recommended Decision and her order of a punitive seven-year debarment were irreparably tainted by the failure of UW attorneys, administrators and officials to inform her, ORI, and the HHS ALJ of the spoliation of Dr. Brodie's research records by UW employees.

69. Defendant Gunderson's failure to reopen the debarment proceedings based on the recent discovery of the spoliation of evidence favorable to Dr. Brodie, which is new and material evidence, was arbitrary and capricious and undermines the very mandate of HHS to ensure "fair" and "unbiased" scientific misconduct investigations.

70.   Taken as a whole, the defendants' actions were arbitrary and capricious, and constituted an abuse of discretion, in violation of § 706(2) of the Administrative Procedure Act (APA), Title 5, and § 50.104, § 93.516, and § 93.515 of the PHS regulations and of Dr. Brodie's constitutional right to due process of law.

## Count II:

## Violation of the PHS Regulations.

71.   Paragraphs 1 through 58 are incorporated as if set forth fully herein.

72.   Under ORI rules, a "research record" in a misconduct investigation "means the record of data or results that embody the facts resulting from scientific inquiry, including but not limited to, research proposals, laboratory records, both physical and *electronic*, progress reports, abstracts, theses, oral presentations, internal reports, journal articles . . . ." 42 C.F.R. § 93.224 (emphasis added).

73.   Under the applicable PHS regulations and ORI's rules, an institution has an obligation to "forward to the agency a copy of the evidentiary record," 65 Fed. Reg. 76263, (December 6, 2000), and "to ensure that it maintains adequate records for a research misconduct proceeding." *Id.*at § 93.305.  As part of its obligation to adhere to its own rules implementing the PHS regulations, UW was obligated to determine the legitimacy of the allegations against Dr. Brodie by retaining and examining "the original databooks or other laboratory materials ... to ensure the accuracy of the original record." *See* UW Executive Order No. 61. The university was also obligated "[w]here appropriate, [to] give the respondent copies of, or reasonable, supervised access to the research records." *Id.*at § 93.305(a).

74.   PHS regulations provide that "[t]o the extent it has not already done so at the allegation stage, the institution must . . . promptly take all reasonable and practical steps to obtain

custody of all the research records and evidence needed to conduct the research misconduct proceeding, inventory the records and evidence, and sequester them in a secure manner." *Id.*at § 93.307(b). S*ee, also, id.*at § 93.310 (d) (obligation of institution to obtain all research records).

75.   Under the PHS regulations, an institution investigating a misconduct charge is required to "[m]aintain and provide to ORI upon request all relevant research records and records of the institution's research misconduct proceeding, including results of all interviews and the transcripts or recordings of such interviews." *Id.*at § 93.313.  *See also id.* at § 93.317(c) (providing that all records relevant to the research misconduct proceedings must be maintained by the institution for seven years after completion of the institution's proceedings or seven years after the completion of any PHS proceeding involving the research misconduct allegation, whichever is later).

76.   Defendants had a legal obligation to conduct a full and fair review of all the evidence relating to a claim of scientific misconduct, including re-opening the investigation and rescinding debarment where new and material evidence becomes available. *See* 2 CFR §§ 180.765-880.

77.   Defendants had a legal obligation to ensure that all evidence relevant to a potential debarment was properly secured, accounted for, and maintained. *See* 45 CFR 74.53 (1).

78.   Defendants had a legal obligation to inform Dr. Brodie of "the destruction, absence of...[his] research records" since the intentional, knowing, or reckless destruction of research records may give rise to an inference of research misconduct on the part of the other scientists in the laboratories of Dr. Brodie's competitors who were linked to the destruction of such evidence. *See* 42 CFR §93.516 (b) (1).

79.   The defendants' conduct, including their denial of Dr. Brodie's request to reopen the administrative proceeding in light of clear of evidence of spoliation of key relevant evidence,

violated their obligation to provide Dr. Brodie with a fair and reliable administrative process,

was arbitrary and capricious, and was accomplished intentionally or with reckless disregard of

Dr. Brodie's rights under the governing PHS regulations.

## Count III:

## Violation of Fifth Amendment Right to Due Process.

80.  Paragraphs 1 through 58 are incorporated as if set forth fully herein.

81.  Dr. Brodie has a protected liberty and property interest in the preservation of data

favorable to him and the destruction of that data during a federally mandated investigation by

investigators means that the results of such investigation are untrustworthy and, when

nonetheless relied upon, irreparably damaged his reputation in the scientific community and the

government's perception of his trustworthiness for receiving and administering public funds, and

ultimately affected his capacity for continued employment as a skilled medical researcher. (ALJ

decision at 27).

82.  Dr. Brodie has a due process right to a fair, unbiased, and impartial institutional and

administrative proceedings that included his right of access to favorable and exculpatory

evidence that would have permitted him to have mounted a full and fair defense.

83. The defendants' spoliation of evidence and the failure to obtain and consider the

relevant research records, and to provide those records to Dr. Brodie deprived Dr. Brodie of his

right not to be deprived of liberty or property without due process law as guaranteed by the Fifth

Amendment to the Constitution of the United States.

84.  The defendants' failure to advise Dr. Brodie of the spoliation of critical evidence,

their failure to provide him a hearing to address the destruction of evidence favorable to him, and

their failure to reopen the administrative and debarment proceedings upon learning of the

spoliation of this critical evidence violated Dr. Brodie's constitutional right to due process of law.

85.   Defendant Gunderson and HHS seriously damaged the public and scientific community's perception of Dr. Brodie's trustworthiness, and his standing and associations in the medical community by debarring Dr. Brodie from **any** government participation or potential participation for a period of seven years based on an incomplete factual record and on arbitrary and capricious recommendations and findings of fact by HHS's ALJ (emphasis added).

86.   The defendants' conduct was done with deliberate indifference or with reckless disregard of Dr. Brodie's constitutional due process rights.

## **RELIEF REQUESTED.**

WHEREFORE, the Plaintiff prays for the following relief:

A.   An immediate stay of the debarment of Dr. Brodie  pending this Court's review;

B.   An order granting the reopening the debarment proceedings;

C.   An order granting preliminary and permanent injunctive relief;

D.   An order reversing the order of debarment; and

E.   All other relief which is just and fair under the law, including the award of attorneys' fees and costs.

Respectfully submitted,

/s/Michael R. Schneider
Michael R. Schneider
MA Bar No. 446475
Good Schneider Cormier
83 Atlantic Avenue
Boston, MA 02110
617.523-5933
ms@gscboston.com

 /s/ John Hardin Young
John Hardin Young, D.C. Bar No. 190553
Sandler Reiff
1025 Vermont Avenue, N.W.
Suite 300
Washington, DC 20005
202.479.1111
202.479.1115 fax
young@sandlerreiff.com

*Counsel to Plaintiff Dr. Scott J. Dr. Brodie*

March 3, 2015