# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT J. BRODIE,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 15-322 (JEB)** |
| **SYLVIA MATHEWS BURWELL,** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

The number three has long enjoyed an almost mythical role in our understanding of success.  Some say the expression "third time lucky" – and its American variant, "third time's the charm" – dates back to Shakespeare's <u>The Merry Wives of Windsor</u>, published circa 1602: "Pr'ythee, no more prattling: go. I'll hold: this is the third time; I hope good luck lies in odd numbers . . . ."  In modern society, the idea that a person is entitled to three chances at success has surfaced in contexts ranging from our criminal-justice system to the game of baseball; while the number of balls required to walk has fluctuated – nine at one point, four presently – the game has always afforded three strikes before "you're out."  <u>See</u> Alexander J. Cartwright, <u>Rules and Regulations of the Knickerbocker Base Ball Club</u> (1845), available at: http://baseball-almanac.com/rulemenu.shtml.  Perhaps it is for this reason that Plaintiff Scott Brodie, a biomedical researcher, believes that this, his third lawsuit seeking to overturn his debarment from receiving federal research funds, might succeed.

Unfortunately for him, federal courts, unlike many other great American institutions, do not afford a person three chances at success.  Instead, courts are limited by the doctrines of *res*

1

*judicata* and collateral estoppel, under which a person may litigate his claim or issue only once; after it has been adversely decided, the litigant may not raise the same claim or issue against the same defendants a second or a third time.  Brodie's first unsuccessful lawsuit challenging his debarment named the Department of Health and Human Services and its various officials as defendants and was decided by this Court, on the merits, in 2011.  His second lawsuit raising the same challenge named the same defendants and was again dismissed – this time, by another judge in this district – on the basis of *res judicata* in 2013.  Undeterred, Brodie has brought yet another action on the identical topic, once again suing HHS and its officials.  They, too, have followed the same playbook and have again moved to dismiss the suit.

Notwithstanding Brodie's blithe assertion that "[t]he issues raised in [the earlier] complaint[s] are not being raised herein," Compl., ¶ 39, Defendants are correct that all the claims or issues Plaintiff asserts in this Complaint either have or could have been brought in his earlier lawsuits.  They are, accordingly, barred by *res judicata* and collateral estoppel.  The Court will thus grant Defendants' Motion, thereby rendering unsuccessful Plaintiff's third attempt to dislodge his debarment.

I. **Background**

Because what happened in court before heavily informs the ruling here, the Court will set forth not only the facts alleged in this Complaint, but also the details of Plaintiff's prior litigation.

A. Debarment

1. *UW Investigation*

Plaintiff, a molecular pathologist, worked as a biomedical researcher at the University of Washington from 1999-2002.  See Compl. at 2; id., ¶ 8 (explaining that, while at UW, Plaintiff

was a Research Assistant Professor in the Department of Laboratory Medicine and Director of

the Retrovirus Pathogenesis and Molecular Virology Laboratories, in which capacity he studied

human herpesvirus and retrovirus pathogenesis); Opp., Attach. 1 (Affidavit of Dr. Scott J.

Brodie), ¶¶ 1-14 (describing Brodie's qualifications and employment history with UW).  In

September 2002, UW initiated an inquiry into several allegations of research misconduct against

Brodie – namely, that he had falsified or fabricated data and images in manuscripts, grant

applications, and presentations.  See Compl., ¶ 10.

During their inquiry, UW investigators "seized and sequestered over 50 computers and

hard drives allegedly relating to Brodie's laboratory, offices, and homes," but "three particular

computers" eventually became the focus of the investigation.  Id., ¶¶ 15-16.  These were "SB

Home," a desktop computer seized from Brodie's home on the first day of the investigation in

September 2002, see id., ¶¶ 17-19; "SB Laptop," which Brodie alleges he had used to transport

data and documents between his various computers but which was "never recovered," id., ¶ 20;

and "SB Residence," a Dell desktop computer normally kept at Brodie's residence, which is the

subject of this lawsuit.  Id., ¶ 21.

According to Brodie, he "informed UW investigators that SB Residence was his principal

computer on which he organized and archived all of his raw data . . . verifying the rigor of his

published research," and that computer stored his draft presentations, manuscripts, and other

publications.  Id., ¶ 22.  He told them that he was the "sole and exclusive" user of SB Residence

until he took it to UW's computer-repair services, where it remained "in UW's possession at the

time UW investigators had sequestered and secured the computers and hard drives in this case."

Id.  Brodie told investigators that images and data obtained from SB Home, a loaner computer,

and from the other sequestered computers "could not be ascribed" to him because they were

shared with other researchers and lab technicians.  <u>Id.</u>, ¶¶ 18, 23.  SB Residence was, therefore, especially important to his defense, as he believed that it would "show that he did not make any alterations in the data or images allegedly found on the other computers examined by UW."  <u>Id.</u>, ¶ 24.  Nevertheless, neither SB Residence nor its contents were ever returned to Brodie; he alleges that he "repeatedly requested, and was repeatedly denied, access to all of his data that were on all of the computers he used at his home."  <u>Id.</u>

In December 2003, UW concluded that Brodie had committed fifteen instances of research misconduct and, based on those findings, "banned him from future employment at the [U]niversity."  <u>Id.</u>, ¶ 27.  UW then sent its final investigative report to the Office of Research Integrity (ORI), part of HHS, for purposes of that office's parallel investigation.  <u>Id.</u>, ¶ 28.

### 2.  *Debarment Proceedings*

On September 17, 2008, ORI filed a charge letter against Brodie asserting that he had engaged in research misconduct and notifying him that it intended to debar him from conducting research supported by federal funds for seven years.  <u>Id.</u>, ¶ 32.  As evidence of such misconduct, ORI identified fifteen images published by Brodie that it contended were based on or reflected false data.  <u>Id.</u>  Seeking to challenge those charges, Brodie requested an evidentiary hearing, and the dispute was assigned to an Administrative Law Judge (ALJ).  <u>Id.</u>, ¶ 33.  Following discovery, ORI moved for summary disposition of the matter.

On January 12, 2010, the ALJ issued his "Recommended Decision" granting summary disposition to ORI.  <u>See</u> Mot., Exh. 1 (Debarment Decision of January 12, 2010) at 1 (AR 00081).  In his Recommendation, the ALJ determined that "[t]he only reasonable inference that I can draw from the undisputed facts of this case is that [Plaintiff] knowingly and intentionally, and on a massive scale, published or attempted to publish false or fabricated information that was

material to the research that he performed." Id. at 6 (AR 00086).  The ALJ's decision made clear that the images were false, a finding Brodie has never disputed during the course of this litigation.  See id. at 2 (AR 00082) (noting that nowhere in his very lengthy filings before the ALJ did Brodie "come to grips with ORI's precise allegations that certain [15 specified] figures . . . published or submitted by [Brodie] were materially false").  The ALJ's decision noted that the "numerous instances of misconduct during a relatively short time frame establish a pattern of misconduct . . . on a grand scale" and recommended debarment for seven years as a penalty for this "extremely serious case of misconduct" by "an individual who is manifestly untrustworthy to receive, utilize, or distribute federal funds."  Id. at 27 (AR 000107).

On March 18, 2010, Defendant Nancy Gunderson, then HHS's Debarring Official, notified Brodie that she had accepted the ALJ's recommendations and would debar him from receiving federal grants and contracts for seven years.  See Compl., ¶ 37.

B.  Prior Litigation

1.  *Brodie I*

In April 2010, Plaintiff filed a Complaint in this district against HHS and its Secretary, the Director of ORI, and the Deputy Assistant Secretary of HHS (Gunderson) seeking to enjoin the agency from implementing the debarment.  See id., ¶ 38.  A little over a year later, on July 12, 2011, this Court granted summary judgment for Defendants.  See Brodie v. U.S. Dep't of Health and Human Servs. (Brodie I), 796 F. Supp. 2d 145, 148 (D.D.C. 2011).  It held that the ALJ's debarment decision properly interpreted applicable regulations and was supported by sufficient evidence; it was not, therefore, arbitrary and capricious.  See id. at 151-56.  The Court further rejected Plaintiff's constitutional challenges to his debarment – specifically, that HHS violated his due-process rights by denying him a hearing to challenge ORI's findings and by

employing a preponderance-of-the-evidence standard of proof instead of a clear-and-convincing standard, and that Defendants violated his Fourth Amendment rights when they searched his premises and computer (presumably, SB Home) during the 2002 UW investigation.  See id. at 156-57.

 2. *Brodie II*

Four months after his first suit was dismissed, Brodie, not content to let well enough alone, filed a petition asking the ALJ to reopen the debarment proceedings on the ground that ORI had violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide him access to "SB Laptop," the computer on which he had transported data between his lab and his home computers.  See Compl., ¶ 40.  Brodie claimed that an ORI attorney had "inadvertently admitted at a compliance conference that ORI had had access to SB Laptop during its investigation, even though it had never provided access to the computer or its contents to Dr. Brodie."  Id.  The ALJ rejected Brodie's petition to reopen the proceedings, and Gunderson also denied the request.  Id., ¶ 41; see also ECF No. 25, Attach. 3 (Exhibits to Brodie Declaration) at 67-69 (2012 Letter from Nancy Gunderson to Scott J. Brodie Re: Request to Reconsider Debarment) (finding "incredible" Brodie's claim that he did not pursue evidence on SB Laptop that he now asserts is crucial because he believed it to be lost and concluding that "[e]vidence purportedly on the alleged Laptop is not material such that reconsideration of Dr. Brodie's Debarment is warranted").

In July 2012, about a year after his first case was dismissed, Brodie filed his second lawsuit in this district, again naming the Secretary and Deputy Assistant Secretary of HHS and the Director of ORI, challenging HHS's decision not to reopen his debarment proceedings.  See Compl., ¶ 42.  On June 27, 2013, Judge Rosemary Collyer granted summary judgment to HHS, ruling that the second suit was barred by *res judicata* and collateral estoppel, and that, in any

event, <u>Brady</u> did not apply to Brodie's debarment proceedings.  <u>Brodie v. Dep't of Health and Human Servs. (Brodie II)</u>, 951 F. Supp. 2d 108, 109-10 (D.D.C. 2013).  The D.C. Circuit summarily affirmed that decision in January 2014.  <u>See</u> <u>Brodie v. U.S. Dep't of Health & Human Servs.</u>, No. 13-5227, 2014 WL 211222 (D.C. Cir. Jan. 10, 2014).

C.  <u>Present Lawsuit</u>

Beginning in 2008, Brodie made public-records requests under the Washington State Public Records Act for information contained in UW's file on his debarment proceedings.  <u>See</u> Compl., ¶ 43.  Although many of these requests were denied, one yielded a batch of documents produced by the University's Office of Public Records in April 2013.  <u>Id.</u>, ¶¶ 44-46.  According to Brodie, those materials, which include "emails and other documents, establish[] that researchers and lab technicians affiliated with Dr. Brodie's competitors had knowingly deleted data on the SB Residence computer . . . during the pendency of UW's investigation."  <u>Id.</u>, ¶ 46.  Brodie alleges that the released documents revealed that UW investigators knew SB Residence was Brodie's primary home computer and had been used solely and exclusively by him, that they were aware SB Residence was in the University's possession during the investigation, and that a UW technician informed a UW attorney via email that he "deleted most of [Dr. Brodie's] files" stored on SB Residence during the investigation.  <u>Id.</u>, ¶ 47.  He further alleges that the documents demonstrate that UW officials knew that SB Residence and its contents were not returned to Brodie and also knew that most of his research and data were stored on its hard drive. <u>Id.</u>  In short, Brodie believes the 2013 public-records releases reveal a "spoliation of the evidence by UW employees," which he insists "severely prejudiced [his] case at all stages of the proceedings against him."  <u>Id.</u>, ¶ 51.

Based on this "newly available discovery of evidence spoliation by UW and of UW's and ORI's failure to obtain Dr. Brodie's original data," Brodie filed a second motion to reopen the debarment proceedings in May 2014. Id., ¶¶ 55-56.  He argued that his earlier debarment proceedings were arbitrary and capricious because ORI's findings of misconduct "were based on inaccurate and incomplete evidence." Id., ¶ 55.  On May 15, 2014, however, Gunderson denied Brodie's request. Id., ¶ 57.  She reaffirmed this denial in a letter dated August 5, 2014. Id. Plaintiff's debarment remains in effect until March 17, 2017, and he alleges that it precludes him from "securing research-related employment both domestically and internationally." Id., ¶ 58.

On March 4, 2015, Brodie filed the instant lawsuit. See ECF No. 1.  His Complaint asserts that HHS's conduct in his debarment proceedings – in particular, Gunderson's decision not to reopen them in 2014 to explore the "spoliation of evidence" and other questions surrounding SB Residence – violated (1) the Administrative Procedure Act; (2) various Public Health Service and HHS regulations; and (3) his Fifth Amendment due-process rights. See Compl., ¶¶ 59-86 (setting out these violations in three separate counts).  He requests a number of forms of relief, including an immediate stay of his debarment pending this Court's review, an order reopening the debarment proceedings, an order reversing the order of debarment, an order granting "preliminary and permanent injunctive relief," and attorney fees and costs. Id. at 26.

Defendants – the same individuals and entities named in both prior lawsuits – have now filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, arguing that all three counts in the Complaint are barred by *res judicata* and collateral estoppel.  That Motion is presently before the Court.

## II.      Legal Standard

### A.   Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and he must thus be given every favorable inference that may be drawn from the allegations of fact.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).  For a plaintiff to survive a 12(b)(6) motion even if "recovery is very remote and unlikely," moreover, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

In evaluating the sufficiency of Plaintiff's Complaint under Rule 12(b)(6), the Court may

consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice." Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). The Court may thus consider those materials on a motion to dismiss without treating the motion "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); see also Marshall v. Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008).

    B.  Rule 56(a)

    Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

    When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary

judgment, the Court must "eschew making credibility determinations or weighing the evidence."

Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The nonmoving party's opposition,

however, must consist of more than mere unsupported allegations or denials and must be

supported by affidavits, declarations, or other competent evidence, setting forth specific facts

showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v.

Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would

permit a reasonable jury to find in its favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242

(D.C. Cir. 1987).

## III.   Analysis

While Plaintiff asserts three separate counts in his Complaint, the gravamen of all three is

that the recently released public records indicate that investigators had access to SB Residence

and that they deleted some information stored on it – including, potentially, documents that

might have been favorable to Brodie's defense.  Of course, if exculpatory evidence was stored on

SB Residence, Brodie, as its sole user, would have known that such information was essential to

his defense from the very first day of the investigation; that possibility is not new.  Indeed,

Brodie argued in his original debarment proceeding that he needed access to information on SB

Residence to prove that someone else, and not he, was responsible for creating or manipulating

the falsified images that he ultimately published or attempted to publish.   But the ALJ found this

argument to be a red herring.  He concluded that even if evidence that others created the false

images did, in fact, exist on SB Residence, it would not undermine his finding that Brodie alone

was liable for publishing the images, thereby committing research misconduct.  (Brodie, it is

worth noting, has never argued, then or now, that data on SB Residence would show that these

fifteen images were either not false or not published by him.)  Even if Plaintiff had obtained

information stored on SB Residence, therefore, the ALJ explained that his debarment recommendation would not have been any different.  This Court affirmed that ruling in <u>Brodie I</u>, and Brodie cannot challenge it again.

All that is new in <u>this</u> case, then, is Brodie's discovery of the deletion of some information from SB Residence – what he calls "spoliation of evidence" – and Gunderson's refusal to reopen his debarment proceedings as a result of that discovery.  The Court will thus assess whether those new facts, and the contentions Plaintiff makes about them, entitle him to any relief.  In so doing, the Court will examine each count in turn.

A. Count I: Reopening Debarment Proceedings

Brodie's first count contends that Gunderson's May 2014 decision not to reopen his debarment proceedings was arbitrary and capricious, in violation of the APA.  He believes that "the recent discovery of the spoliation evidence [is] favorable to [him as well as] new and material," and thus warranted a reopening of those administrative proceedings, which is permitted by 2 C.F.R. § 180.888.  <u>See</u> Compl., ¶ 69.  Defendants rejoin that this count is "simply a new iteration of <u>Brodie II</u> – albeit focused on the SB Residence computer instead of the laptop computer."  Mot. at 5.  They are correct that the count "suffers from the same fundamental flaws as his prior lawsuit," <u>id.</u> – namely, that it is barred by *res judicata* and collateral estoppel.  The Court tackles each of these defenses separately.

1. Res Judicata

"[U]nder *res judicata*, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were <u>or could have been raised</u> in that action.'"  <u>Drake v. F.A.A.</u>, 291 F.3d 59, 66 (D.C. Cir. 2002) (quoting <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980)) (emphasis added).  "Res judicata may be asserted in a motion to dismiss when 'all relevant facts

are shown by the court's own records, of which the court takes notice.'" Nader v. Democratic Nat. Comm., 590 F. Supp. 2d 164, 169 (D.D.C. 2008), aff'd, No. 09-7004, 2009 WL 4250599 (D.C. Cir. Oct. 30, 2009) (quoting Hemphill v. Kimberly-Clark Corp., 530 F. Supp. 2d 108, 111 (D.D.C. 2008)).  Here, because Defendants have moved to dismiss or, in the alternative, for summary judgment, the Court may consider materials in the administrative record and prior court documents in determining whether *res judicata* bars the suit.

 "The Court applies a three-part test to determine whether *res judicata* applies: '(1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case.'" McIntyre v. Fulwood, 892 F. Supp. 2d 209, 214 (D.D.C. 2012) (quoting Youngin's Auto Body v. District of Columbia, 711 F. Supp. 2d 72, 78 (D.D.C. 2010)).

A preliminary issue here is what specific agency action Plaintiff intends to contest in this count.  Brodie argues that he is challenging only Gunderson's May 2014 decision not to reopen his debarment proceeding.  His Opposition, however, almost exclusively targets the ALJ's original decision in January 2010 and Gunderson's subsequent imposition of a seven-year debarment.  To be safe, the Court considers separately whether each potential claim that Plaintiff is asserting in Count I – (1) that the original debarment, in light of new information about SB Residence, violated the APA or (2) that the recent refusal to reopen the debarment proceedings violated the APA – is barred by *res judicata*'s three-prong test.

### a.  Original Debarment

If Brodie contends that the ALJ's 2010 debarment decision violated the APA, given what he has now learned about SB Residence, that position would certainly satisfy the first prong: this

Case 1:15-cv-00322-JEB   Document 30   Filed 06/13/16   Page 14 of 30

claim was adjudicated finally in Plaintiff's first lawsuit.  See Brodie I, 796 F. Supp. 2d at 156.  In addition, the parties appear to agree that the third prong is satisfied inasmuch as Defendants in this matter are the same litigants against whom Brodie's prior complaints were asserted. Whether such a claim would be barred by *res judicata*, then, turns on the second prong of the test – *i.e.*, whether Brodie could have raised his contentions about SB Residence in his first lawsuit. This, in turn, requires a discussion of what Brodie knew at the time of the first lawsuit, as he could not have been expected to make arguments based on knowledge he did not have.

In fact, Brodie's own allegations reveal that he knew all along that SB Residence "contained all of [his] lab notes, original data, drafts of grants and communications with colleagues."  Compl., ¶ 21.  He also knew that SB Residence was in the University's possession at the time of the investigation, and he alleges that he "repeatedly requested, and was repeatedly denied, access to all of his data that were on all of the computers he used at his home" during the investigation.  Id., ¶ 24.  In Defendants' view, because Brodie was familiar with both the contents on SB Residence and the allegations of research misconduct being investigated, he has known from the beginning of this saga whether that computer contained material and potentially exculpatory evidence.

The Court concurs.  In Brodie I, Plaintiff could have argued that one reason the ALJ's decision was arbitrary and capricious was that he did not consider the evidence stored on SB Residence.  His failure to do so in that lawsuit now means that this argument is barred by *res judicata*, which bars any claim he could have raised in an earlier suit against the same party.  See Appalachian Power Co. v. EPA, 251 F.3d 1026, 1033-34 (D.C. Cir. 2001) ("*[R]es judicata* bars relitigation not only of matters determined in a previous litigation[,] but also ones that a party could have raised.").  As the Brodie II court stated in a parallel situation, "[I]f Dr. Brodie truly

believed the laptop were critical to his defense, it behooved him to have complained of its absence years ago," during his first lawsuit.  See 951 F. Supp. 2d at 118 n.5.  The same is true for SB Residence.  In any event, it is unlikely that such an argument about SB Residence would have prevailed in Brodie I, given that Plaintiff failed to make a motion requesting that the ALJ compel Defendants to produce that computer during discovery before the debarment decision or to otherwise pursue access to its contents.  Nevertheless, the potential futility of a claim does not obviate the need to make it in the first lawsuit, for *res judicata* "forecloses all that which might have been litigated previously" – not merely all that might have been successfully litigated.  See I.A.M. Nat'l Pension Fund, Ben. Plan A v. Indus. Gear Mfg. Co., 723 F.2d 944, 949 (D.C. Cir. 1983) (emphasis added).

     In sum, to the extent that Brodie believes that data stored on SB Residence is relevant to his culpability, and that imposing a debarment without giving him a chance to access and present that data is arbitrary and capricious, such a claim is nothing more than an attempt to contest, for a third time, the ALJ's 2010 debarment decision and the analysis contained therein.  Under the well-established principle of *res judicata*, such an attempt must fail.  Accord Brodie II, 951 F. Supp. 2d at 117 (explaining that the Brodie I court "held that the Debarring Official's decision did not violate the APA.  Thus, the premise underlying Dr. Brodie's complaint here—that the HHS Debarring Official [Defendant Gunderson] erred in concluding that Dr. Brodie engaged in research misconduct—has already been raised and rejected.").  Although Brodie tries to put a new spin on an old argument, the Court cannot give him a third chance to prevail on the same claim.

     b.  Refusal to Reopen

On the other hand, if Count I seeks to advance only the contention that Gunderson's May 2014 decision not to reopen the 2010 debarment proceedings violated the APA, a different result obtains. For that claim was not "adjudicated finally in the first action" – this Court's decision in 2011 – or in the second action – Judge Collyer's decision in 2013. See McIntyre, 892 F. Supp. 2d at 214. It could not have been adjudicated in either of the prior lawsuits because they concluded before the agency action Brodie now challenges. As a result, if Count I contests the decision not to reopen the debarment proceedings, it would not satisfy the first prong of *res judicata*, and so that doctrine poses no obstacle to its advancement. But even if *res judicata* – also known as "claim preclusion" – does not stop Count I in its tracks, its sister doctrine – collateral estoppel or "issue preclusion" – might. The Court therefore turns next to that issue.

2. *Collateral Estoppel*

"Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980). In other words, "an issue of fact or law that was actually litigated and necessarily decided is conclusive in a subsequent action between the same parties or their privies." Johnson v. Duncan, 746 F. Supp. 2d 163, 168 (D.D.C. 2010). When that factual or legal issue "is essential to the judgment, [it] is conclusive in a subsequent action between the parties, whether on the same or a different claim." Consol. Edison Co. of N.Y. v. Bodman, 449 F.3d 1254, 1258 (D.C. Cir. 2006) (internal citation omitted). This means that even if Brodie's claim in this lawsuit is understood to challenge only the propriety of the May 2014 decision not to reopen the debarment proceedings, it may still be blocked by the doctrine of collateral estoppel. This is so because the factual or legal issues on

which such a claim relies may have already been adjudicated in a prior matter between the two

parties. This is the question the Court must now decide.

a. Threshold Challenge

Brodie's primary challenge is that a reopening of the administrative proceedings was

warranted because SB Residence is material to his defense that others in his laboratory or his

accuser, rather than he, created the false images. See Opp. at 36-37. In Brodie II, Plaintiff

advanced a similar contention, "insist[ing] that his laptop is material to his defense and that

without it he will be unable to prove he did not fabricate or falsify any of the images." 951 F.

Supp. 2d at 118. The court nonetheless found that claim unavailing because of the debarring

ALJ's decision, affirmed by this Court in Brodie I, that any arguments pertaining to the creation

of the false information were immaterial. Id. The same is true here: The ALJ's decision that

"[i]t is irrelevant that there may have been other computers that [Brodie] had control over . . .

[and] that others may have shared the computers or actually done the manipulations that [Brodie]

falsely represented as products of his research" applies with as much force to SB Residence as it

did to Brodie's laptop. See Debarment Decision at 11 (AR 00091). To the extent that Brodie

believes the ALJ should have reopened the proceedings to examine the debarment in light of

evidence stored on SB Residence, he is collaterally estopped from arguing that such evidence is

crucial to assessing his culpability; to prevail on that argument would require a relitigation of

Brodie I's legal conclusion that the evidence on the computer is immaterial. It would seem,

therefore, that the collateral-estoppel inquiry ends there, as it did in Brodie II.

b. Spoliation of Evidence

Brodie's other contention, however, is that this case differs from Brodie II because of the

"spoliation of evidence" on SB Residence, see Compl., ¶ 51, which was not at issue with the

17

laptop in that case.  In Brodie's present Complaint, he emphasizes the effect of the <u>deletion</u> of

data from SB Residence on his ability to mount a defense, and his belief that the "spoliation of

the evidence . . . made it impossible for [him] to use the Data and images from SB Residence."

<u>Id.</u>  Helpfully, he enumerates the specific ways that he believes this "spoliation of evidence"

impeded his defense, alleging that it made it impossible for him:

1. To show that files on SB Residence were "'reflective of the actual results' and data he and his lab had properly obtained";
2. "To show what [he] believed he was publishing when he included the images in question in the Power Point presentations, manuscripts, and grant applications . . . and that he had good reason to believe that these images were the result of valid research";
3. To show that he always believed the images to be "reflective of the actual results obtained from the experiments";
4. To refute claims that "many of the questioned images in Dr. Mullins grants came from Dr. Brodie, when in fact they came from Dr. Mullins and Dr. Mullins's collaborators";
5. To show that the UW investigators' report "contained false, inaccurate, and misleading information and did not . . . support the investigative committee's findings";
6. To show that Brodie's emails on SB Residence "were consistent with those produced in recent public record disclosures";
7. To show that Brodie could not, "without his electronic records," properly defend himself against accusations that he knowingly and intentionally committed research misconduct; and
8. To show that the investigative committee could not "meet its burden of proving by a preponderance of the evidence" that the accusations were true.

<u>See</u> <u>id.</u>

These are, presumably, the arguments Brodie would have raised at a reopening of his

debarment proceedings, had such relief been granted.  The Court, however, believes that all of

them rely for their success on legal issues that were already litigated and decided in his original

debarment proceedings and judicial review thereof.  In other words, while Brodie argues that the

deletion of material from SB Residence constitutes "newly discovered material evidence," which

may be the basis of a debarring official's decision to "reduce or terminate [his] debarment," 2

C.F.R. § 180.888(a), the Court has already affirmed the ALJ's decision that the deleted evidence

is <u>not</u> material – meaning that its deletion is also not relevant to his culpability.  For the ALJ in

2010 assumed *arguendo* that evidence favorable to Brodie might exist on the computers not produced during the UW investigation – including SB Residence – but concluded that such evidence could not counteract the overwhelming evidence of Brodie's misconduct.  See Debarment Decision at 8 (AR 00088).  Brodie's arguments all seek to challenge either that conclusion directly or the findings on which it rests, both of which are "question[s] or fact[s] in dispute that ha[ve] been judicially and finally determined" by this Court in affirming the ALJ's decision.  See Nasem v. Brown, 595 F.2d 801, 805 n.9 (D.C. Cir. 1979) (citation omitted).  A careful look at each issue Brodie would raise at a reconsideration hearing concerning the alleged spoliation of evidence illustrates that they all seek to relitigate issues already decided.

The first three issues pertain to Brodie's claim that the images he published either were not false or were not known to him to be so.  But he already argued before the ALJ that "he was always of the belief that the images in ORI's charges were reflective of the actual results obtained from the experiments and he had no reason to suspect the images he provided were inappropriately manipulated."  See Debarment Decision at 9 (AR 00089).  The ALJ rejected this claim, finding that

> the assertion is utterly implausible on its face in light of the volume of undisputed evidence produced by ORI.  This is not a case of a single error in data or one or even a few mislabeled images. The sheer mass of false and fabricated information that Respondent either published or attempted to publish overwhelms Respondent's unsubstantiated contention that he believed that what he was publishing was his honest research results.

Id.  This finding was affirmed by this Court in Brodie I.  See 796 F. Supp. 2d at 155 (holding that ALJ's conclusions on this point "were reasonable given the overwhelming evidence of fabrication and falsification").  His argument that Gunderson should permit him to readdress the

falsity issue with "new evidence" is merely an attempted "relitigation of an issue actually and necessarily litigated and determined in a prior final judgment." Nasem, 595 F.2d at 805.

Here, a brief aside is warranted:  Even were Defendants to reopen Plaintiff's debarment proceedings to permit the introduction of new evidence as to Brodie's knowledge of the falsity of the images, the ALJ's ultimate debarment conclusion would not be displaced.  For the ALJ determined that intentionally publishing false information includes those circumstances "where the scientist publishes information with indifference to its truth," Debarment Decision at 8 (AR 00088), and that Brodie "[e]ither [] published information that he knew to be false or fabricated, or he published it with indifference to the truth of its contents.  The sheer volume and pattern of false items that [Brodie] published or attempted to publish lead inescapably to [the] conclusion that [Brodie] had contempt for the truth." Id. at 9 (AR 00089).  This Court examined that determination at length and ultimately affirmed it.  See Brodie I, 796 F. Supp. 2d at 151-54. Brodie never contends that his "new evidence" would disrupt that conclusion, meaning that even if collateral estoppel did not bar him from raising the first three issues, doing so would have no impact on his debarment.

As to the fourth issue Brodie believes he cannot prove due to the "spoliation of evidence" – his claim that false images he published either originated with or were tampered with by his accuser, Dr. Mullins – that, too, was rejected by the ALJ in his debarment proceedings.  The ALJ found that Brodie "was the person who published the false information [and he] bore responsibility for assuring that his published information was what he purported it to be.  He cannot now hide behind the assertion that others may have been responsible for creating the false and fabricated information that he published." Debarment Decision at 7 (AR 00087).  To be sure, Brodie's argument here takes on a slightly different cast, as he now argues that without

examining the deleted data files from SB Residence, the investigators "could not have made an accurate and reliable determination about . . . who was responsible for allegedly creating, preparing, or publishing altered or mislabeled images." Compl., ¶ 52. He believes "[t]he missing files would show exactly who created, modified, altered or relabeled the original files at issue." Id., ¶ 53. But the ALJ expressly found that even if Brodie "personally created <u>none</u> of the false images and data" – meaning that Mullins or anyone else created every image Brodie published – "that possibility does not change the outcome of this case." Debarment Decision at 8 (AR 00088). That this reasoning was neither arbitrary nor capricious was, in turn, the express holding of this Court in <u>Brodie I</u>. <u>See</u> 796 F. Supp. 2d at 153-55. Dissatisfied as he may be with that conclusion, Brodie is collaterally estopped from litigating it again. <u>See Brodie II</u>, 951 F. Supp. 2d at 117-18.

The fifth and eighth issues – that the UW report could not support the findings adopted by the ALJ and that ORI could not prove, by a preponderance of the evidence, that its accusations were true – are related and are, again, issues that have already been litigated by Plaintiff and decided against him. As the <u>Brodie II</u> court explained, "Judge Boasberg [in <u>Brodie I</u>] rejected Dr. Brodie's challenges to [the ALJ's decision,] . . . explicitly finding that there was sufficient evidence to support the findings of research misconduct and that the debarment decision was not arbitrary or capricious." <u>Brodie II</u>, 951 F. Supp. 2d at 118. The same is true in this case, as well; arguments going to the sufficiency of the evidence before the ALJ in 2010, therefore, are barred by collateral estoppel.

The sixth issue – that the emails produced in public-record disclosures are consistent with those found on SB Residence – seems either wholly irrelevant or relevant only because he

believes it undermines the ALJ's finding of research misconduct.  The latter, as just explained, is an issue he is precluded from raising in a new suit against these Defendants.

The seventh way that Brodie believes his defense was impeded by the "spoliation of evidence" is his claim that without the materials on SB Residence – including the deleted materials – he could not properly defend himself against ORI's accusations.  This is a drum Brodie has been beating throughout the debarment proceedings, not a new argument or an argument based on new evidence.  As the ALJ noted, "What [Brodie] has never explained is what might exist in materials to which he has allegedly been denied access that would change the dynamics of this case in the slightest."  Debarment Decision at 10 (AR 00090).  Brodie previously argued that the "two Dell computers that were purchased for him by UW" – one of which is SB Residence – "did not contain evidence of image fabrication."  Id.  In support of that assertion, he sought to file an affidavit signed by his wife averring as much, months after the deadline for exchanging evidence had expired and without a showing of good cause for the affidavit's late submission.  Id.  The ALJ nevertheless determined that the affidavit had no bearing on the debarment conclusion because it did not address "the very specific allegations by ORI that [Brodie] published images and data that were altered and falsified."  Id. at 11 (AR 00091).  That is, the vague assertion that one of his computers contained some useful information was "irrelevant" because it failed to contravene any one of the fifteen specific findings of research misconduct made by ORI.  Id.  The ALJ himself reviewed these fifteen findings in detail – devoting fourteen pages of the debarment decision to the findings – and ultimately credited them as evidence of misconduct.  Id. at 12-25 (AR 00092-AR00105).  The ALJ reasoned that unless Brodie could explain which materials on the other computers, including SB Residence, might contradict those findings, the debarment decision would not be disturbed

even if Brodie had had access to the other computers or their contents.  Id.  This "issue of law" –
*viz.*, that the materials on Brodie's other computers were irrelevant to his debarment – was
therefore "actually litigated and necessarily decided," Duncan, 746 F. Supp. 2d at 168, affirmed
by this court in Brodie I, 796 F. Supp. 2d at 155, and found to be preclusive of further litigation
on the issue in Brodie II, 951 F. Supp. 2d at 117.  The same result obtains today.

Finally, Brodie argues elsewhere in his Complaint that the deletion of information from
SB Residence "irreparably tainted" ORI's investigation and the ALJ's recommendation.  See
Compl., ¶¶ 67-68.  He does not, however, explain why this is so.  The Court assumes that Brodie
intends to claim that the discovery of the deletion of exculpatory material by investigators would
undermine the results of their investigation.  That claim, however, relies for its success on the
assertion that the deleted material was exculpatory, which – as just explained – the ALJ found,
and the Court affirmed, it was not.

In sum, all of the contentions Brodie claims the spoliation of evidence prevented him
from making rely on legal or factual issues that have already been litigated and decided in the
agency's favor; as a result, the Court must conclude that he is collaterally estopped from raising
such issues again.  Put another way, to conclude that HHS's decision not to reconsider Brodie's
debarment was arbitrary and capricious, the Court would need to make legal or factual
determinations contrary to those it already affirmed in Brodie I – *i.e.*, that data on SB Residence
was material to his culpability – and such a situation is precisely what issue preclusion aims to
prevent.  Thus, even if Count I is understood to challenge only the 2014 refusal-to-reopen
decision, rather than the agency's original 2010 debarment decision, it would still be barred by a
doctrine that underscores finality in litigation – *i.e.*, collateral estoppel.  Because both

understandings of Count I are barred by such a doctrine, the Court will grant summary judgment

to Defendants on that count.[1]

B. Count II: Regulatory Violations

In Count II, Brodie veers from his general APA claim and instead argues that Defendants

violated specific regulations.  He alleges that his debarment "was accomplished . . . with reckless

disregard of [his] rights under the governing" Public Health Service (a component of HHS)

regulations.  See id., ¶ 79.  While he discusses a variety of regulations throughout his lengthy

Complaint, Brodie identifies only four that he maintains Defendants violated.  He first contends

that UW was obliged to "retain[] and examin[e] the original databooks or other laboratory

materials to ensure the accuracy of the original record," id., ¶ 73 (citation and quotations

omitted), and to give him copies of or access to the research records.  Id. (citing 42 C.F.R. §

93.305).  He next asserts that PHS regulations required Defendants to "conduct a full and fair

review of all the evidence relating to a claim of scientific misconduct, including reopening the

investigation and rescinding debarment where new and material evidence becomes available."

Id., ¶ 76 (citing 2 C.F.R. §§ 180.765-880).  Defendants also were obliged, he contends, to

"ensure that all evidence relevant to a potential debarment was properly secured, accounted for,

and maintained."  Id., ¶ 77 (citing 45 C.F.R. § 74.53(1)).  He believes they violated that

obligation by deleting materials from SB Residence.  Id.  He further believes the agency violated

---

[1] A simpler way of attacking Count I could well have been a motion for summary judgment on the administrative record, arguing that Gunderson's refusal to reopen Brodie's debarment proceedings was not arbitrary and capricious.  Because Defendants did not raise it, however, the Court does not consider this alternative argument.
    Finally, the Court notes that Plaintiff also briefly contends in his Complaint that the destruction of his original research records by UW employees – the deletion of data from SB Residence – itself violates the APA, regardless of its effect on his debarment.  See Compl., ¶ 61.  He makes a similar allegation that the investigators' failure to inform him of the deletion violated the APA.  See id., ¶¶ 62-63.  But he never contends that either the deletion or the failure to inform him of it was a "final agency action" within the meaning of the APA, nor does he devote any space to this contention in his Opposition.  The Court will thus ignore it.

applicable regulations by failing to inform him of those deletions.  Id., ¶ 78 (citing 42 C.F.R. §
93.516(b)(1)).

This count quickly runs aground.  First, none of the specific regulations cited creates a
freestanding cause of action.  And to the extent that Brodie hopes that regulatory violations are
generally actionable under the APA, they are duplicative of the now-dismissed Count I.  Finally,
Plaintiff identifies no other statute or cause of action that might render a violation of any of the
regulations actionable.  See Frederick v. Hillyer, 82 F. Supp. 3d 435, 440 (D.D.C. 2015)
("Language in a regulation may invoke a private right of action that Congress through statutory
text created, but it may not create a right that Congress has not . . . .  Agencies may play the
sorcerer's apprentice but not the sorcerer himself.") (quoting Alexander v. Sandoval, 532 U.S.
275, 291 (2001)); see also SAI v. Dep't of Homeland Security, No. 14-1876, 2015 WL 8966920,
at *8 (D.D.C. Dec. 15, 2015) ("The fact that those implementing regulations require" an agency
to take various actions "does not create a cause of action where Congress has failed to do so.").
In other words, it is well settled that a facial violation of a regulation does not, in and of itself,
give rise to a cause of action in federal court.

Even were that not the case, Defendants contend that Brodie relies in Count II on the
same regulations he cited in Brodie II, including 42 C.F.R. § 93.305.  The Court there held that
he had waived arguments related to these regulations by raising them for the first time in his
Reply brief, and, in any event, they would be barred by res judicata and collateral estoppel.  See
Brodie II, 951 F. Supp. 2d at 118 n.6; see also Mot. at 4 n.4.

Defendants are correct that Plaintiff did argue in Brodie II, albeit late in the summary-
judgment briefing cycle, that HHS violated its own regulations pertaining to records
maintenance.  See No. 12-1136, ECF No. 20 (Pl. Reply) at 2-4 (citing 42 C.F.R. §§ 93.313(h),

93.317(d), 93.305).  In that brief, Brodie did not specifically mention all of the same regulations

listed in his Complaint in this case, but he did raise the argument that HHS had violated

applicable regulations when the agency conducted its research-misconduct investigation.

Specifically, he argued that Defendants' handling of the evidence during the investigation,

including their failure to properly preserve records or to grant him access to relevant materials,

was improper.

The fact that Plaintiff now mentions by name new regulations does not remove this count

from the ambit of *res judicata*, for "[t]here are no new facts.  [Plaintiff] is simply raising a

[slightly] new legal theory.  This is precisely what is barred by *res judicata*."  Apotex, Inc. v.

Food & Drug Admin., 393 F.3d 210, 218-19 (D.C. Cir. 2004).  The vast majority of the

contentions set forth in Count II, therefore, are barred by *res judicata* because the claim that

Defendants violated relevant regulations during their investigation and the subsequent debarment

proceedings was raised and decided in the earlier matters.

Only one of the claims raised in Count II is based on facts unknown to Plaintiff at the

time of either of his prior lawsuits – *viz.*, the contention that Defendants violated PHS regulations

by failing to reopen the debarment proceedings in light of "new and material evidence."  Compl.,

¶ 76.  This claim is "based on a different nucleus of facts than were those advanced in" Brodie I

and Brodie II, since his second request for reconsideration of his debarment had not yet occurred

at the time that either of those lawsuits was under way.  See Drake v. Fed. Aviation Admin., 291

F.3d 59, 66 (D.C. Cir. 2002).  Yet the regulations permitting reconsiderations of debarments

make clear that such reconsideration is entirely discretionary.  See 2 C.F.R. § 180.880 ("The

debarring official may reduce or terminate your debarment based on – (a) newly discovered

material evidence . . . or (e) other reasons the debarring official finds appropriate.") (emphasis

added).  As such, although Brodie's allegation that Defendants' May 2014 conduct violated the

debarment-reconsideration regulations is the only allegation in Count II not barred by *res*

*judicata*, it cannot clear the Rule 12(b)(6) threshold.  The Court will, consequently, dismiss

Count II in its entirety.

     C.  <u>Count III: Due Process Violation</u>

     In his last count, Brodie alleges that Defendants violated his rights under the Due Process

Clause of the Fifth Amendment.  He claims that he has "a protected liberty and property interest

in the preservation of data favorable to him[,] and the destruction of that data during a federally

mandated investigation . . . means that the results of such investigation are untrustworthy and . . .

irreparably damaged his reputation . . . and ultimately affected his capacity for continued

employment as a skilled medical researcher."  Compl., ¶ 81 (citing Debarment Decision at 27).

He further claims that he has a due-process "right of access to favorable and exculpatory

evidence," which was violated by Defendants' alleged "spoliation of evidence and the[ir] failure

to obtain and consider the relevant research records, and to provide those records to Dr. Brodie."

<u>Id.</u>, ¶¶ 82-83.  Finally, he believes Defendants' failure to advise him of the alleged spoliation of

"critical evidence," failure to provide him a hearing to address such spoliation, and failure to

reopen his debarment proceedings all violated his due-process rights.  <u>Id.</u>, ¶ 84.

     This kitchen-sink approach to pleading results in a confused assortment of issues.  If

Plaintiff seeks to challenge, on due-process grounds, the procedural adequacy of his

administrative debarment proceedings, that claim was decided five years ago.  <u>See</u> <u>Brodie I</u>, 796

F. Supp. 2d at 156 ("Plaintiff's Complaint alleges that Defendants violated his Fifth Amendment

due process rights . . . .  Defendants argue that Plaintiff received all the process that was due. . . .

Given Plaintiff's abandonment of this count, the Court finds Defendants are entitled to summary

judgment [on it].").  Any variation on this theme of the procedural adequacy of his debarment proceedings is, of course, barred by *res judicata*.  So, too, is any due-process claim he could have raised during either of his earlier cases – including those alleging inadequate access to evidence and damage to his reputation and employment prospects.

What is left, then, are the "spoliation of evidence" allegations.  Strangely, in the 40 pages of his Opposition, Brodie never discusses his due-process claims.  He does nothing more than mention, in passing, that the agency violated its "obligation to ensure Brodie a 'fair' and 'unbiased' scientific misconduct investigation that comported with . . . Brodie's constitutional due-process rights."  Opp. at 34.  But he never responds to Defendants' contention that this argument is barred by *res judicata*, suggesting that Brodie has again abandoned his due-process claims in this case.  See, e.g., Hayes v. District of Columbia, 923 F. Supp. 2d 44, 51 (D.D.C. 2013) (granting summary judgment to defendant where "[t]he plaintiff, in her Opposition, does not specifically dispute the defendant's argument regarding her negligence claim" and thus "apparently concedes the negligence claim").

Even if he has not abandoned the claims, he has certainly not offered a robust defense of them.  Brodie never explains why, if he believed he had a liberty or property interest in the contents of SB Residence, he did not raise that issue before the ALJ or before this Court in Brodie I or Brodie II.  After all, he knew, as far back as the beginning of the UW investigation, that the University was in possession of SB Residence and had not returned it to him or otherwise provided him access to its contents.  He could easily have raised any due-process arguments about the materials stored on that computer during his debarment proceedings or Brodie I.  Even if Plaintiff's due-process claim is concerned not with access to the materials on SB Residence but only with the alleged deletion of some of those materials by Defendants, he

still could have raised that concern in <u>Brodie II</u>.  Brodie learned of the deletion of materials from SB Residence in April 2013, <u>see</u> Compl., ¶¶ 44-46, while that case was still pending.  (<u>Brodie II</u>, the reader may recall, was decided in June 2013.)  Even if the spoliation-of-evidence issue "involves some new facts that were not included" in <u>Brodie I</u> or <u>Brodie II</u>, because Brodie learned of those facts while <u>Brodie II</u> was still pending, "Plaintiff could have raised it in the prior litigation."  <u>Alford v. Providence Hospital</u>, 60 F. Supp. 3d 118, 127 (D.D.C. 2014).  If a lawsuit is pending, Plaintiff must raise all facts related to the same "nucleus of facts" in that case; if he could have but did not bring those facts to the attention of the court in which the case was pending, he may not bring a later action stemming therefrom.  <u>See</u> <u>Akosile v. Armed Forces Retirement Home</u>, No. 12-307, 2015 WL 6692240, at *5 (D.D.C. Nov. 2, 2015).  The doctrine of *res judicata* thus bars all of the due-process claims Brodie seeks to assert, and the Court will grant Defendants summary judgment on them.

* * *

As the D.C. Circuit has explained, "*Res judicata* plays a central role in advancing the 'purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions.'" <u>Apotex</u>, 393 F.3d at 217 (citing <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979)); <u>see also</u> <u>Montana</u>, 440 U.S. at 153-54 ("To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.").  Although Brodie remains discontented with his debarment, which the Court does not doubt has had a real and significant impact on his life and career, "[i]n the final analysis, it is also important to note that [Brodie] is not the only party with interests at stake in these cases; rather, . . . [D]efendant[s]

in both lawsuits[] ha[ve] a right of protection from 'repetitious litigation involving the same causes of action.'" <u>Alford</u>, 60 F. Supp. 3d at 130 (quoting <u>Jenson v. Huerta</u>, 828 F. Supp. 2d 174, 179 (D.D.C. 2011)).  In this case, then, the third time is not the charm, and dismissal with prejudice of Brodie's Complaint is warranted.

**IV.     Conclusion**

      For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss or for Summary Judgment.  A separate Order consistent with this Opinion will issue this day.


                             /s/ James E. Boasberg
                             JAMES E. BOASBERG
                             United States District Judge

Date:  <u>June 13, 2016</u>